UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re

                                    Chapter 7

Stephen Jemal
        *aka* Stephen S. Jemal,                Case No. 12-43825-CEC
                        and
Sharon Jemal
        *aka* Sharon E. Jemal,

                        Debtors.
--------------------------------------------------------X
Gerritsen Beach Investments Ltd. and
SSST Riviera Investments I, Ltd.,

                        Plaintiffs,

-against-                                  Adv. Pro. No. 12-1260-CEC

Stephen Jemal and Sharon Jemal,

                        Defendants.
--------------------------------------------------------X

## <u>DECISION</u>

APPEARANCES:

| | |
|---|---|
| Stephen Vlock, Esq. | Scott A Krinsky, Esq. |
| Vlock & Associates, P.C. | Backenroth, Frankel & Krinsky, LLP |
| 630 Third Avenue | 800 Third Avenue |
| 18th Floor | 11th Floor |
| New York, NY 10017 | New York, NY 10022 |
| *Attorneys for Plaintiffs* | *Attorneys for Defendants* |

CARLA E. CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the motion of Gerritsen Beach Investments Ltd. ("Gerritsen Beach Investments") and SSST Riviera Investments I, Ltd. ("SSST Riviera," and together with Gerritsen Beach Investments, the "Plaintiffs") for summary judgment declaring a money judgment which they obtained against Stephen Jemal ("Stephen") and Sharon Jemal ("Sharon," and together with Stephen, the "Debtors" or "Defendants") nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) and (a)(6).  The Plaintiffs allege that they were induced by the Debtors' false financial statement to transfer their equity interests in certain real estate projects to the Debtors in exchange for an unsecured promissory note.  The Debtors argue that questions of material fact concerning whether the Plaintiffs reasonably relied on the financial statement, or were damaged as a result, preclude summary judgment under § 523(a)(2)(B).[1] Because there is no question of material fact that the Plaintiffs reasonably relied on the Debtors' falsified financial statement in accepting the their note in exchange for their interests, summary judgment is awarded, declaring the debt owed by Stephen to the Plaintiffs nondischargeable pursuant to § 523(a)(2)(B).  However, material questions of fact concerning the nature and extent of Sharon's role in the fraud preclude the entry of summary judgment against her.

## JURISDICTION

This Court has jurisdiction of this core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), 28 U.S.C. § 1334, and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012.  This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Rule 7052.

---

[1] Unless otherwise indicated, "Section" or "§" refers to a section under title 11 of the United States Code (the "Bankruptcy Code"), and "Rule" refers to the Federal Rules of Bankruptcy Procedure.

1

## BACKGROUND

The following facts are undisputed, or are matters of which judicial notice may be taken, unless otherwise indicated.

In 2005, the Debtors sought financing for real estate development projects in Mill Basin, Sheepshead Bay, and Gerritsen Beach, all located in Brooklyn, New York.  (Pl. Local Rule 7056-1 Stmt. ¶ 1, ECF No. 20; Def. Local Rule 7056-1 Counter-stmt.  ¶ 1, ECF No. 24.)[2]

In December 2005, SSST Riviera contributed $1,550,000 in exchange for a 28% equity interest in SSJ of Mill Basin I Group, LLC (the "Mill Basin Project"), and in February 2006, contributed $1,040,670 in exchange for a 28% equity interest in SSJ Development of Sheepshead Bay I, LLC (the "Sheepshead Bay Project").  (Pl. Local Rule 7056-1 Stmt. ¶¶ 3, 4, 6, 7, ECF No. 20; Def. Local Rule 7056-1 Counter-stmt.  ¶¶ 3, 4, 6, 7, ECF No. 24.)  Later, in March 2006, Gerritsen Beach Investments contributed $2.9 million in exchange for a 28% equity interest in SSJ of Gerritsen Beach I, LLC (the "Gerritsen Beach Project," and together with the Mill Basin Project and the Sheepshead Bay Project, the "Real Estate Projects").  (Pl. Local Rule 7056-1 Stmt. ¶¶ 9, 10, ECF No. 20; Def. Local Rule 7056-1 Counter-stmt.  ¶¶ 9, 10, ECF No. 24.)

In 2007, Stephen sought to obtain a construction loan, which he said was essential to the success of the Real Estate Projects.  (Pl. Local Rule 7056-1 Stmt. ¶ 12, ECF No. 20; Def. Local Rule 7056-1 Counter-stmt.  ¶ 12, ECF No. 24.)  Stephen represented to the Plaintiffs that the potential lender would not extend the loan, and the projects would become worthless, unless the Plaintiffs waived their contractual rights or agreed to sell their 28% interests in each of the Real Estate Projects.  (Pl. Local Rule 7056-1 Stmt. ¶¶ 13, 14, ECF No. 20; Def. Local Rule 7056-1

---

[2] Unless otherwise indicated, "ECF No." refers to the docket number of a document filed in Adversary Proceeding Number 12-1260-CEC.

Counter-stmt. ¶¶ 13, 14, ECF No. 24.) The Plaintiffs allege that the Debtors offered to purchase the Plaintiffs' equity interests in the Real Estate Projects in exchange for a promissory note and pledge agreement. (Pl. Local Rule 7056-1 Stmt. ¶ 15, ECF No. 20.) The Plaintiffs allege that before agreeing to sell their equity interests under those conditions, they requested the Debtors' personal financial statement. (Pl. Local Rule 7056-1 Stmt. ¶ 16, ECF No. 20.)

The Plaintiffs allege that on September 18, 2007, Stephen emailed the Debtors' personal financial statement to the Plaintiffs, which reflected that the Debtors' net worth was in excess of $90 million. (Pl. Local Rule 7056-1 Stmt. ¶¶ 16, 17, ECF No. 20.) The personal financial statement and attached account statements from Southwest Securities reflected that the value of Debtors' "readily marketable securities" was over $31 million. (Pl. Local Rule 7056-1 Stmt. ¶ 18, ECF No. 20.) The Plaintiffs allege that, in reliance on that financial statement, they sold their 28% equity interests in the Real Estate Projects to the Debtors in exchange for the unsecured promissory note, resulting in the Debtors' sole ownership of those developments. (Pl. Local Rule 7056-1 Stmt. ¶¶ 20, 21, ECF No. 20.)

The Debtors defaulted on the promissory note, and, on April 9, 2010, the Plaintiffs obtained a money judgment against them in the amount of $7,887,325.70. (Pl. Local Rule 7056-1 Stmt. ¶ 22, ECF No. 20.) The Plaintiffs allege that, when they attempted to collect on the judgment, they discovered that the Debtors' personal financial statement falsely reflected that they owned "tens of millions of dollars in stocks such as Google, Halliburton, Microsoft and Intel," whereas in reality, the Debtors owned assets of nominal value only. (Pl. Local Rule 7056-1 Stmt. ¶¶ 19, 23, ECF No. 20.)

On May 25, 2012, the Debtors filed a voluntary petition under chapter 7 of the Bankruptcy Code. (Voluntary Petition, Case No. 12-43825, ECF No. 1.) Schedule A lists three

real properties, valued at $3.52 million, all of which are listed a fully encumbered.  (Schedule A, Case No. 12-43825, ECF No. 23.)  Schedule B lists personal property valued at $17,119.34, including a total of $2,350.32 held in brokerage accounts, custodial brokerage accounts, and a joint savings account with the Debtors' son.  (Schedule B, Case No. 12-43825, ECF No. 23.)  Schedule B also lists the Debtors' equity interest in 41 limited liability companies, including the three real estate developments, and values those interests at $0.  (Schedule B, Case No. 12-43825, ECF No. 23.)

On August 31, 2012, the Plaintiffs commenced this adversary proceeding to obtain a determination that the debt owed to them is nondischargeable, and on February 7, 2014, the Plaintiffs moved for summary judgment pursuant to Rule 7056 seeking a determination that the debt owed to them is nondischargeable under §§ 523(a)(2)(B) and (a)(6).

## **LEGAL STANDARD**

### I.       **Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is considered material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  No genuine issue exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (citations omitted).  "More specifically, [the opposing party] must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on

conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted).

## II.    Nondischargeability under § 523(a)(2)

The Plaintiffs seek summary judgment determining that the debt owed to them is nondischargeable pursuant to § 523(a)(2)(B), which provides:

> A discharge under section 727 . . . does not discharge an individual debtor from any debt — for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . .
> (B) use of a statement in writing —
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B).

A creditor may be granted summary judgment on a determination of nondischargeability by establishing the absence of any genuine issue of material fact as to each of the elements of its claim. In re Kelley, 163 B.R. 27, 34 (Bankr. E.D.N.Y. 1993). Because the nondischargeability of a debt may have "harsh consequences" for a debtor, "exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor." Denton v. Hyman (In re Hyman), 502 F.3d 61, 66 (2d Cir. 2007).

## DISCUSSION

The Plaintiffs argue that they are entitled to relief under § 523(a)(2)(B) because, in reliance on the falsified financial statements, they sold their interests in the Real Estate Projects in exchange for the Debtors' promissory note. The Plaintiffs argue that the financial statements, which were intentionally falsified and provided by Stephen, were materially false because they

represented that the Debtors' net worth was over $90 million, and that the value of their "readily marketable securities" was over $31 million, when, in reality, the Debtors did not own assets close to that value.  (Pl. Mem. of Law in Supp., at 9, ECF No. 21.)

Documentary evidence establishes that Stephen transmitted the falsified financial statement to the Plaintiffs to induce them to sell their interests in the Real Estate Projects to the Debtors.  (Aff. of Douglas A. Tatum dated February 5, 2014 ("Tatum Aff."), Ex. G, ECF No. 19.)  Although the Defendants generally deny "knowledge or information sufficient to form a belief" as to these allegations, they do not specifically dispute either that the financial statements were falsified or that they were provided by Stephen to the Plaintiffs to induce the Plaintiffs to transfer their interests in the Real Estate Projects.  See Pl. Local Rule 7056-1 Stmt. ¶¶ 16-19, ECF No. 20; Def. Local Rule 7056-1 Counter-stmt.  ¶¶ 16-19, ECF No. 24.  Nor have the Defendants come forward with evidence which raises a genuine question of material fact on these points.  Accordingly, the Plaintiffs have satisfied the elements of § 523(a)(2)(B)(i), (ii), and (iv).  However, the Defendants contend that whether the Plaintiffs actually and reasonably relied on the financial statements is a factual question that precludes summary judgment.

## I.    Actual Reliance

The Plaintiffs allege that "[i]n reliance on the Defendants' falsified Southwest Securities statements and their fraudulent personal financial statements, Plaintiffs sold their respective secured equity interests . . .  in exchange for an unsecured promissory note signed by the Defendants."  (Pl. Local Rule 7056-1 Stmt. ¶ 20, ECF No. 20)  This assertion is supported by the affidavit of Douglas A. Tatum ("Tatum"), a limited partner of the Plaintiffs, stating that:

> [I]n order for [the Plaintiffs] to consider exchanging our secured equity interests for an unsecured personal promissory note, we needed to be certain that the Defendants had the financial strength to pay on the promissory note, and that the Defendants had more

> than sufficient assets to guaranty recovery in the event that the Defendants were to default.  Consequently, my partners and I requested that the Defendants provide a personal financial statement and evidence of their assets.

(Tatum Aff. ¶ 20, ECF No. 19.)  Additionally, in an email to Stephen on September 18, 2007, Tatum asked for the Defendants' financial statements "before we give you an answer on changing the deal."  (Tatum Aff., Ex. G, ECF No. 19.)  In reply to this email, Stephen sent Tatum the falsified financial statements.  (Tatum Aff., Ex. G, ECF No. 19.)  Further evidence of the Plaintiffs' actual reliance is contained in a "Unanimous Consent" that was executed by Tatum and the other partners of the Plaintiff entities.  The Unanimous Consent contains the following recital:

> WHEREAS, . . . [Stephen and Sharon] Jemal has agreed to personally execute a promissory note . . .  payable to the [Plaintiffs] in the amount of their investments plus some return thereon and [Stephen and Sharon] Jemal ha[ve] previously provided financial statements to the Partners reflecting the ability to pay this Note;

(Def. Opp'n, Ex. F, ECF No. 26.).

The Defendants generally deny that the Plaintiffs relied on the fraudulent personal financial statement in connection with the transaction.  (Def. Local Rule 7056-1 Counter-stmt. ¶ 20, ECF No. 24.)  As evidentiary support, the Defendants cite Stephen's affidavit, which describes the negotiation of the sale terms but does not mention that the Plaintiffs requested the Defendants' financial statement.  (Aff. of Stephen S. Jemal dated February 25, 2014 ("Stephen Aff."), ¶ 5-9, ECF No. 22.)  Stephen's affidavit further states, in a conclusory manner, that the Plaintiffs "never relied on my representations," and instead relied on the representations of Patrick Morris, a Senior Vice President of Republic First Bank, a friend of one of the Plaintiffs' principals, who introduced the Plaintiffs' principals to the Defendants.  (Stephen Aff., ¶¶ 2-3, 10, ECF No. 22.)  The Defendants' conclusory, unsupported assertion that Plaintiffs did not actually

rely on the fraudulent financial statement is not sufficient to raise a genuine question of material fact concerning the Plaintiffs' reliance on the Defendants' personal financial statements as shown by Tatum's affidavit, the emails of September 18, 2007, and the Unanimous Consent.  That the Plaintiffs may have also relied upon representations made by Patrick Morris at Republic First Bank is irrelevant; a creditor need not rely solely on a debtor's falsified financial statement in order to satisfy § 523(a)(2)(B)(iii).  Barristers Abstract Corp. v. Caulfield (In re Caulfield), 192 B.R. 808, 821 (Bankr. E.D.N.Y. 1996) ("It is sufficient that the creditor's reliance on the Debtors' representations was a contributing factor in causing the loss even though such reliance was partial."); In re Salzman, 61 B.R. 878, 888 (Bankr. S.D.N.Y. 1986) (finding debt nondischargeable because creditor relied on statements "even though such reliance was partial and not solely motivated by the debtor's false representations"); In re Ebbin, 32 B.R. 936, 941 (Bankr. S.D.N.Y. 1983) (Creditor "need not show that it relied solely on the financial statement to prevail; partial reliance would suffice.").  The evidence shows that the Plaintiffs relied on the Defendants' personal financial statement as part of the overall transaction, and such reliance is sufficient.

## II.    Reasonable Reliance

The Defendants also argue that the Plaintiffs' reliance on the fraudulent personal financial statement was not reasonable.  While it is true that reasonable reliance under § 523(a)(2)(B)(iii) is a question of fact, In re Bonnanzio, 91 F.3d 296, 305 (2d Cir. 1996), it is also well established that, to defeat a motion for summary judgment, the nonmovant must raise a genuine issue of material fact supported by evidence, as required by Federal Rule of Civil Procedure 56(c)(1), made applicable to this proceeding by Rule 7056.  JP Morgan Chase Bank v. Tamis, No. 05-CV-737-JLL, 2005 WL 6794655, at *3 (D.N.J. Nov. 16, 2005) (stating, in the

context of a § 523(a)(2)(B) summary judgment motion, that "[o]nce the moving party files a properly supported motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact.").

"Once it has been established that a debtor has furnished a lender a materially false financial statement, the reasonableness requirement of § 523(a)(2)(B) 'cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith.'" Bonnanzio, 91 F.3d at 305 (quoting Bank One, Lexington, N.A., v. Woolum (In re Woolum), 979 F.2d 71, 76 (6th Cir. 1992)). A creditor is not obligated to conduct a thorough investigation of the representations a debtor makes in the course of extending credit. In re Wong, 291 B.R. 266, 275-76 (Bankr. S.D.N.Y. 2003) ("[C]reditors are not required to conduct an investigation outside of ordinary business practices before entering into agreements with prospective debtors."); In re Erdheim, 180 B.R. 42, 46 (Bankr. E.D.N.Y. 1995) (stating that "reliance on a debtor's financial statement [may] be reasonable, even where the creditor failed to take steps to verify the information"). "Reasonableness is therefore 'a low hurdle for the creditor to meet, and is intended as an obstacle only for creditors acting in bad faith.'" Bonnanzio, 91 F.3d at 305 (quoting In re Shaheen, 111 B.R. 48, 53 (S.D.N.Y. 1990)).

There is no suggestion here that the Plaintiffs acted in bad faith to induce the Defendants into submitting a false personal financial statement. See In re Reisman, 149 B.R. 31, 39 (Bankr. S.D.N.Y. 1993) (noting that the purpose of the reasonable reliance requirement is to prevent creditors from inducing debtors to submit false statements to subsequently use to challenge discharge of the debt). The record shows that the Plaintiffs cleared the "low hurdle" of showing that they acted reasonably in relying on the personal financial statements in transferring their interests in the Real Estate Projects in exchange for Debtors' promissory note. Bonnanzio, 91

F.3d at 305.  See In re Smith, No. 10-73228-REG, 2012 WL 1605245, at *4 (Bankr. E.D.N.Y.

May 8, 2012) ("Courts reviewing the reasonableness of a creditor's decision to lend should be

deferential to that creditor's business judgment."); Reisman, 149 B.R. at 39 (applying "the

degree of care that a reasonably prudent person would exercise in an average business

transaction under similar circumstances" as the standard in determining reasonable reliance).

The parties' pre-existing business relationship further supports the conclusion that the Plaintiffs

were justified in accepting the personal financial statements as truthful without conducting an

independent investigation.  In re Lavender, 399 F. App'x 649, 654 (2d Cir. 2010) (affirming

nondischargeability decision that cited four year business relationship as a factor in finding

reasonable reliance).  See In re Shaheen, 111 B.R. 48, 53 (S.D.N.Y. 1990) (holding that

plaintiff's reliance on debtor's misrepresentation was reasonable in part because debtor was an

owner, director, and manager of plaintiff corporate entity).

 The Defendants argue that the low threshold for showing reasonable reliance set in

Bonnanzio is inapplicable to the Plaintiffs, who "did not advance or loan any monies to or on

behalf of the Debtors, much less in connection with the Note."  (Def. Mem. of Law in Opp'n, at

20, ECF No. 25.)  The Plaintiffs surrendered equity interests in exchange for the Defendants'

note.  Bonnanzio does not prescribe a different analysis of reasonable reliance for a creditor who

parts with property, other than money, in exchange for a promissory note.  See generally

Bonnanzio, 91 F.3d 296.  The Defendants have cited no authority that supports applying

different standards to lenders of money than to other creditors, and have provided no logical

rationale to create such a distinction.

 The Defendants argue that the Plaintiffs relied on Mr. Morris's representations that the

Defendants had sufficient finances and assets to guarantee the promissory note.  The Defendants

have not produced any evidence to rebut Mr. Tatum's sworn statement that the Plaintiffs relied

on the requested financial statements in agreeing to sell the equity interests in exchange for a

promissory note, and, as noted above, partial reliance is sufficient under § 523(a)(2)(B).

Salzman, 61 B.R. at 888; Caulfield, 192 B.R. at 821.  If, as the Defendants contend, the Plaintiffs

also relied in part on representations made by Mr. Morris, this fact bolsters the Plaintiffs' claim

that their reliance was reasonable.  See In re Rodriguez, 29 B.R. 537, 540 (Bankr. E.D.N.Y.

1983) (finding that the fact that the lender sought credit reports on the debtor supported the

reasonableness of the lender's reliance); In re Hambley, 329 B.R. 382, 400 (Bankr. E.D.N.Y.

2005) (finding that the creditor's visit to the debtor's business and interviews with employees

strengthened the creditor's reasonable reliance, since the third-party information corroborated the

debtor's misrepresentation).

The Defendants contend that the Plaintiffs' reliance on their personal financial statements

was unreasonable because they ignored "glaring red flags," such as the delay in moving forward

with the Real Estate Projects, and evidence that Stephen violated the operating agreements

governing the Real Estate Projects, by, among other things, commingling funds, placing

unauthorized debt on one of the projects, transferring money to himself from the Gerritsen Beach

Project without authorization, failing to timely submit a budget for approval, and allowing the

Real Estate Projects to default on interim loans.  (Def. Mem. of Law in Opp'n, at 16-18, ECF

No. 25.)  These issues may suggest problems with the Real Estate Projects, but are wholly

unrelated to whether the Defendants possessed the financial wherewithal portrayed in the

personal financial statement.  The Defendants also allege that the Plaintiffs' knowledge of their

interest in Nobody Beats the Wiz, a business entity that filed for bankruptcy in 1998, should have

caused the Plaintiffs to conduct research that would have revealed that Stephen "had failed at

other business ventures as well." (Def. Mem. of Law in Opp'n, at 20, ECF No. 25.) The information about the bankruptcy of Nobody Beats the Wiz and other failed business ventures, which occurred years prior to this transaction, also bears little, if any, relationship to the Defendants' 2007 personal financial statement, and is therefore not the sort of information that should have prompted the Plaintiffs to challenge the veracity of the representations contained in that statement. See In re Gertsch, 237 B.R. 160, 170 (B.A.P. 9th Cir. 1999) ("Lenders do not have to hire detectives before relying on borrowers' financial statements.").

The Defendants also identify two purported "red flags" that relate to the preparation of the personal financial statement: it was unsigned, and it was dated February 28, 2007, almost seven months before it was provided.

A personal financial statement need not be signed to be relied upon, as "[i]t is sufficient that [d]ebtors either wrote, signed, or adopted such statement" for purposes of § 523(a)(2)(B). In re Boice, 149 B.R. 40, 45 (Bankr. S.D.N.Y. 1992); see Hambley, 329 B.R. at 399 (finding letters, emails, and other documents satisfied "writing" requirement of § 523(a)(2)(B)). Here, it is undisputed that Stephen emailed the fraudulent personal financial statement and the annexed falsified account statements to Mr. Tatum. (Pl. Reply Mem. of Law in Supp. at 4-5, ECF No. 31).

The Defendants allege that it was unreasonable to rely on the fraudulent personal financial statement because it was "stale" when transmitted to the Plaintiffs on September 18, 2007. (Def. Mem. of Law in Opp'n, at 17, ECF No. 25.) However, the Plaintiffs do not contend that the documents were inaccurate because they provided a false picture of the Defendants' financial condition due to the passage of time. The Plaintiffs contend, and it is not disputed, that the personal financial statement described a financial condition that never existed. Furthermore,

on the same day he emailed the personal financial statement to the Plaintiffs, Stephen stated in a subsequent email, also dated September 18, 2007, that "nothing has changed" with respect to the financial statement.  (Reply Aff. of Douglas A. Tatum dated March 10, 2014 ("Tatum Reply Aff."), Ex. B, ECF No. 30.)  Given Stephen's email, the statement's printed date did not make it unreasonable for the Plaintiffs to rely on the personal financial statement as a description of the Defendants' present financial condition.  See In re Robinson, 192 B.R. 569, 577 (Bankr. N.D. Ala. 1996) ("[The debtor's] oral representation that his financial condition had not changed since that set forth in the January 15, 1991 statement defeats this argument, . . . brought the financial statement current and cured any staleness.").

Last, the Defendants assert that the personal financial statement itself contains discrepancies that should have prompted the Plaintiffs to investigate further.  The Defendants note that the Southwest Securities account statements attached to the personal financial statements reflected that $14,930,080 of the securities were held in custodial accounts owned by the Defendants' children.  It is not disputed that the brokerage statements attached to the personal financial statement showed Sharon as the named custodian on the custodial accounts for certain "marketable securities" listed on the personal financial statement.  (Tatum Aff., Ex. G, ECF No. 19.)  However, the disclosure of Sharon's custodial interest in these accounts does not make the Plaintiffs' reliance on the personal financial statement unreasonable.  The Plaintiffs could have reasonably relied on other written representations in the financial statement, including that the Defendants held approximately $17 million in equity securities in their own names.  (Tatum Aff., Ex. G, ECF No. 19.)

The Defendants also note that dividend income from the "readily marketable securities" was not reflected on the personal financial statement.  The Defendants point out that

(12) the unsigned February 2007 PFS shows no annual "Dividend Income" (GB001963), even though the Jemals purportedly owned $31,960,760 in marketable securities (GB001964);

(13) all of the Southwest account statements contain only "0.00" amounts for the "Estimated Annual Income" for all of the securities (GB001968, GB001970-GB001973 & GB001983-GB001984), even though there should be substantial dividend income;

(Def. Mem. of Law in Opp'n, at 8, ECF No. 25.)  Rather than undermining the reasonableness of Plaintiffs' reliance, these facts show that the personal financial statement and the brokerage account statements corroborate one another.  See In re Hough, 111 B.R. 445, 450 (Bankr. S.D.N.Y. 1990) (finding that creditor satisfied the reasonable reliance element of § 523(a)(2)(B) where the document on its face reveals the debtor's personal financial condition, so no affirmative duty to investigate arises).  In sum, the personal financial statements, including the supposed inconsistencies identified by defendants, did not give the Plaintiffs "reason to know that the financial statement is false."  In re Boice, 149 B.R. 40, 47 (Bankr. S.D.N.Y. 1992).  See also Reisman, 149 B.R. at 39 (holding that lender need not verify all of the information in debtor's financial statements, because the reasonable reliance requirement is intended to prevent "unscrupulous creditors from inducing debtors to submit false statements so that they can be later used to object to the debtor's discharge").

III.    Causation

The Defendants also contend that the Plaintiffs failed to prove that the Defendants' fraud caused them any actual losses.  They argue that the Plaintiffs are required to prove that the interests in the Real Estate Projects transferred in exchange for the Defendants' promissory note were in fact worth more than the $620,000 partial payment made by the Defendants on the note. (Def. Mem. of Law in Opp'n, at 21, ECF No. 25.)  The Defendants also argue that the terms of the transaction provided that the transfer of the Plaintiffs' 28% interest was contingent on the

Defendants' full payment of $6.2 million on the note, which never occurred.  Id. at 23.  As a result, the Defendants argue, the Plaintiffs did not assign their 28% membership interest, so they were not damaged.

The Defendants' contention that no assignment of the Plaintiffs' membership interest occurred is easily dealt with.  This argument appears to be based upon a statement in the recitals of the agreements entitled Assignment of LLC Membership Interest ("Assignments"), which the Plaintiffs executed with respect to their interests in each of the Real Estate Projects, that "[t]his Assignment is made subject to the full performance by Assignee and others of their respective obligations under the Note."  (Def. Opp'n, Ex. G, ECF No. 26.)  However, the operative language of the Assignments is unconditional, and clearly states that the Assignments are effective as of September 12, 2007.  Id. at ¶¶ 1, 3.[3]  Language appearing in a recital will not be construed to vary the terms of an agreement that is otherwise unambiguous.  Country Cmty. Timberlake Vill., L.P. v. HMW Special Util. Dist. of Harris, No. 12-00825, 2014 WL 1478009, at *6 (Tex. App. Apr. 15, 2014) ("Recitals in a contract do not control the operative clauses of the contract unless the latter are ambiguous."); accord, Musman v. Modern Deb, Inc., 392 N.Y.S.2d 24, 26 (App. Div. 1st Dept 1977) ( "Where a recital clause and an operative clause are inconsistent, the operative clause if unambiguous, should prevail.") (citing Williams v. Barkley, 58 N.E. 765, 767 (N.Y. 1900)).

---

[3] Each of the Assignments provides that "1. Assignment.  Assignor does hereby assign, transfer and convey unto Assignee all of the Assignor's Interest, including, without limitation, all of Assignor's economic interest in the Company, its interests in the Company's capital, profits and losses and its interests or right to participate in or to receive any economic benefits by reason of Assignor's position as a member in the Company under or pursuant to the Agreement. . . . 3. Effect of Assignment.  This Assignment is effective as of the Effective Date [September 7, 2007] hereof set forth herein above, and after that date, all profits, losses, distributions, allocations, liabilities, obligations, income and gains of the Company allocable to the Assignor's Interest shall be credited, charged, allocated or distributed, as the case may be, to Assignee, and not to Assignor . . . ."  (Def. Opp'n, Ex. G, ECF No. 26.)

The Defendants' second argument is that the Plaintiffs, in addition to demonstrating reliance on the false financial statements, must prove the value of their interests in the Real Estate Projects in order to show damages caused by their reliance.  This argument is equally meritless; it is "inconsistent with the express language of the Code," which sets forth the elements which must be shown to obtain a determination of nondischargeability under § 523(a)(2)(B), and contains no such requirement.  In re Priestley, 201 B.R 875, 885 (Bankr. D. Del. 1996).  As the Priestley court noted, "[a]ny required element under Code § 523(a)(2)(B), which is a creature of statute rather than of the common law, must be included in the statutory language."  Id. (citing Field v. Mans, 516 U.S. 59, 69 (1995)).

Here, the statutory language is clear.  Section 523(a)(2)(B) excepts from discharge "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . ." use of a false financial statement.  "Debt" is defined as "liability on a claim"; "claim," in turn, is defined as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."  § 101(12), (5A).  The Plaintiffs transferred their interests in the Real Estate Projects in exchange for the Defendants' promissory note, and this transfer of property was induced by the Defendants' false financial statement.  The Debtors' obligation to the Plaintiffs pursuant to the promissory note (which has been reduced to judgment) therefore is clearly a "debt [liability on a claim] for money [or] property" obtained by use of the Debtors' false financial statement, and as such is excepted from discharge.

The Defendants' argument that the Plaintiffs must fulfill an additional requirement, not contained in the statute, of proving the value of the interests they transferred to the Defendants, is based on language quoted from three cases: In re Khafaga, 419 B.R. 539, 548 (Bankr. E.D.N.Y.

2009); In re Caulfield, 192 B.R. 808, 821 (Bankr. E.D.N.Y. 1996); and In re Park, 492 B.R. 668, 683-84 (Bankr. S.D.N.Y. 2013).  The Defendants misrepresent the holdings of Khafaga and Caulfield, and Park is inapplicable to the facts of this case.  In Khafaga, because the plaintiff received false financial reports after it entered into a franchise agreement with the defendant, the court found that the plaintiff could not "allege that the allegedly false reports provided by the Defendant induced it to enter into the" agreement.  Khafaga, 419 B.R. at 548.  The "requisite causal connection" lacking in Khafaga was reliance, as required by § 523(a)(2)(B)(iii).  Similarly, in Caulfield, the court did not hold that causation, beyond a showing of reliance, is required under § 523(a)(2)(B); it held that there was "absolutely no evidence that [the plaintiff] relied on [the false] statement in any manner, that the statement was material to [the plaintiff] . . . or that it caused any loss to [the plaintiff]."  Caulfield, 192 B.R. at 821.  Given that the plaintiff in Caulfield failed to meet its statutory burden to show reliance and materiality, the court's reference to causation is, at most, dictum.

Park involved a challenge to dischargeability by a casino that provided gambling chips to the debtor in exchange for two "counter checks," drawn on the debtor's checking account, on which was imprinted the statement that the debtor had funds "on deposit" in the account to cover the checks.  Park, 492 B.R. at 672.  The "counter checks" were essentially promissory notes which could be presented by the casino for collection 45 days after issuance by the debtor.  Id. at 687.  The court found that, although the Debtor's checking account did not contain funds to cover the checks at the time he signed them, the debtor had other funds available in an amount sufficient to cover the checks, and therefore concluded that the debtor's misrepresentation was not material.  Id. at 687.  The court also found that the plaintiff did not rely on the misrepresentation.  Id. at 690.

The <u>Park</u> court also found causation to be lacking on the facts before it, concluding that the casino's losses were caused, not by the debtor's misrepresentation concerning the funds in his checking account, but by the fact that, during the 45 days between the debtor's issuance of the counter checks and the casino's presentation of them for collection, the debtor dissipated the funds which he had available to cover the counter checks at the time that they were signed. This could equally be found to preclude any claim of reliance by the casino, and indeed the <u>Park</u> court found that the casino could not claim justifiable reliance on representations concerning "a state of facts 45 days before the date those facts would matter." <u>Id.</u> at 689. This delay could also be found to rebut any assertion that the debtor's misrepresentation was material, and the <u>Park</u> court found that, for this reason, among others, it was not. <u>Id.</u> at 687. In any event, the <u>Park</u> court's analysis of the facts before it in terms of causation is neither necessary to the result in that case nor applicable to the instant case.

The circuit court cases cited by <u>Park</u> in discussing the applicability of a causation requirement in an action under § 523(a)(2)(B) provide no support for the Defendants' position that the Plaintiffs are required to prove the value of the interests that they transferred in exchange for the Defendants' promissory note. <u>Siriani v. Northwestern Nat'l Ins. Co. (In re Siriani)</u>, 967 F.2d 302 (9th Cir. 1992), involved a claim that a debtor had presented false financial statements in order to obtain the renewal of a bond. The court found that the creditor was required to provide evidence that it had "valuable collection remedies" at the time that it renewed credit to

the debtor.[4]  In <u>Collins v. Palm Beach Savings & Loan (In re Collins)</u>, 946 F.2d 815 (11th Cir.

1991), the court rejected the debtor's contention that the creditor's damages were proximately

caused by the failure to perfect a security interest in the debtor's assets, holding that "[a]lthough

[the creditor] could have prevented its own injury by perfecting its security interest in [the

debtor's] collateral property, the Bankruptcy Code does not require such diligence on the part of

a creditor induced by fraudulent means in extending credit to a debtor."  <u>Id.</u> at 816.

Here, the Debtors do not argue that an intervening event, such as failure to perfect a

security interest, actually caused the Plaintiffs' losses (the argument rejected by the <u>Collins</u>

court), or that the falsified financial statements related to the forbearance, renewal, extension, or

refinancing of debt.  Rather, the Debtors are attempting to collaterally attack the Plaintiffs'

judgment against them, by arguing that the property they received in exchange for the

promissory note — the Plaintiffs' interest in the Real Estate Projects — was not worth what the

Defendants agreed to pay for it.  Whether labeled an argument concerning causation or damages,

the Defendants' contention that the Plaintiffs must demonstrate the value of the interests that

they transferred in exchange for the Defendants' promissory note must be rejected, as it is

inconsistent with the terms of the statute and unsupported by case law.

## IV.    Judgment as to Sharon

Although Stephen sent the Debtors' fraudulent personal financial statement to the

Plaintiffs, the Plaintiffs assert that Sharon's debt to them should also be nondischargeable

---

[4] Other courts of appeals have disagreed with <u>Siriani</u>.  <u>Wolf v. Campbell (In re Campbell)</u>, 159 F.3d 963, 967 (6th Cir. 1998) (holding that creditors were not required to show that the debtor's fraud in obtaining their forbearance to collect caused them additional injury such as loss of a collection remedy); <u>In re McFarland</u>, 84 F.3d 943, 947 (7th Cir.1996) (holding that "the text of § 523(a)(2)(B) contains no damage or detriment requirement, and the courts are not empowered to add one"); <u>Norris v. First Nat'l Bank (In re Norris)</u>, 70 F.3d 27, 29 n. 6 (5th Cir. 1995) (same); <u>Shawmut Bank v. Goodrich (In re Goodrich)</u>, 999 F.2d 22, 25-26 (1st Cir. 1993) (same).

pursuant to § 523(a)(2)(B). The Debtors assert that Sharon is "merely a homemaker and a mother," and that the Plaintiffs have failed to prove that Sharon had actual knowledge of Stephen's fraudulent acts, which would be required to except her debt from discharge. (Def. Opp'n, at 25-27, ECF No. 25.) The Plaintiffs respond that Sharon's liability to them should be nondischargeable because of her ownership interest in the Real Estate Projects. (Tatum Reply Aff. ¶ 21, ECF No. 30.)

In opposition to the Plaintiffs' contention that Sharon's debt should be excepted from discharge, the Debtors rely upon In re Hill, 425 B.R. 766 (Bankr. W.D.N.C. 2010), in which a law firm sued co-debtor spouses under § 523(a)(2)(A) and (B), seeking a judgment that their pre-petition legal bills were nondischargeable. The firm's case rested on statements of the co-debtor husband promising to make future payments on his and his wife's debt to the firm. The firm argued that the debtors' legal bill should be nondischargeable because the co-debtor husband repeatedly made promises of future payment with knowledge that future payment was impossible, and such promises induced the firm to continue its representation. As to the co-debtor wife, court found that the firm "offered no proof that [she] had any involvement with the [promises] made by [the husband]," or that she "had any knowledge of these statements before or even after their dissemination." Hill, 425 B.R. at 774. As a result, the court granted the co-debtor wife's motion for a directed verdict and held that her debt to the law firm was dischargeable. Id.

Hill stands for the proposition that a spousal relationship alone is not a basis for imputing the fraudulent acts of one spouse to the other spouse. The Hill court noted that the appropriate analysis is under the law of agency, and that "[w]ithin the confines of agency theory, the Fourth Circuit has affirmed that a wife is not the agent of her husband strictly by force of the marital

relationship." Hill, 425 B.R. at 773.  Other courts are in accord.  See In re Tsurukawa, 287 B.R. 515, 527 (B.A.P. 9th Cir. 2002) (holding that "in order to impute fraud to a spouse, there must be a partnership or other agency relationship.") (internal quotations omitted); Matter of Luce, 960 F.2d 1277, 1284 n.10 (5th Cir. 1992) ("It is irrelevant to the determination of the dischargeability of [a co-debtor spouse's] debts under section 523(a)(2) that the business partners also enjoyed a marital relationship.").

However, in the Second Circuit, where a debtor's right to a discharge is challenged, the fraudulent intent of an agent of the debtor will be imputed to the debtor only when the debtor either knew of or recklessly disregarded the agent's fraud.  In re Lovich, 117 F.2d 612 (2d Cir. 1941), involved a challenge to the discharge of two debtors engaged in business as partners, under § 32(c)(3) of the Bankruptcy Act, which denied discharge to a "bankrupt who has 'obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing or causing to be made or published in any manner whatsoever, a materially false statement in writing respecting his financial condition.'" Id. at 614.  The manager of the debtors' business, who was "the husband of one partner and brother of the other," acting within his authority as agent, provided a false financial statement to Dun & Bradstreet, which was relied on by a creditor in extending credit to the business.  Id. at 613.  The Second Circuit held that "[o]n principle we think that more should be shown to justify withholding a discharge that [sic] an agent made a fraudulent statement within the scope of a general authority to transact the bankrupt's business." Id. at 615.  The court concluded that, for this reason, when a debtor's discharge is challenged based upon a false statement by an agent, "some additional facts must exist justifying an inference that the bankrupt knew of the statement and in some way acquiesced

in it or failed to investigate its accuracy." Id.[5]  At least one court has found that reckless disregard of an agent's fraud may justify its imputation to the principal in an action to deny dischargeability.  See In re Salzman, 61 B.R. 878, 890 (Bankr. S.D.N.Y. 1986) ("When a principal of a corporation signs false documents without examining them and either knows or should have known of the fraud, the requisite intent to defraud may be inferred from such reckless disregard of the accuracy of the facts, because had the principal paid minimal attention, he would have been alerted to the fraud.").

Here, the record is insufficient to conclude that circumstances exist justifying the imputation of Stephen's fraud to Sharon.  It is clear that Stephen acted in his capacity as manager of SSJ Holdings, which was 96% owned by Sharon, and of which she was a member-manager, when negotiating the transaction that resulted in the transfer of the Plaintiffs' interest in the Real Estate Projects to the Debtors.  (Tatum Reply Aff., Ex. F, ECF No. 30.)  As such, Stephen was acting as Sharon's agent when he submitted the falsified financial statements.  It is equally clear that Sharon benefited from Stephen's actions as her agent in negotiating the transaction.  When Stephen fraudulently induced the Plaintiffs to accept the Defendants' note in exchange for their equity in the Real Estate Projects, Sharon's ownership interest was increased; moreover, the stated purpose of the transaction was to increase the value of the Real Estate Projects by securing a new construction loan, and the Real Estate Projects were 72% owned by SSJ Holdings, which was, in turn, 96% owned by Sharon.

However, Sharon's affidavit in opposition to the Plaintiffs' motion states that she did not have any knowledge of the financial statements that were sent by her husband, that she did not

---

[5] Although Lovich involved a challenge to the debtor's right to a discharge, not an objection to the dischargeability of a particular debt, given the similarity of the statutory language there at issue to § 523(a)(2)(B), the standard set in Lovich is appropriately applied here.

discuss the falsified financial statements with her husband, and that she did not communicate

with the Plaintiffs during the course of negotiating the transaction.  (Aff. of Sharon Jemal dated

February 25, 2014 ("Sharon Aff."), ¶ 3, ECF No. 23.)  Whether Sharon actually knew of the

fraudulent financial statements, or otherwise engaged in conduct that would justify a conclusion

that she acquiesced in or recklessly disregarded Stephen's fraud, is an issue of material fact that

must be determined at trial.

## V.    Nondischargeability under § 523(a)(6)

The Plaintiffs also seek summary judgment on the basis of their § 523(a)(6) cause of

action.  Under § 523(a)(6), a debt for "willful and malicious injury by the debtor to another entity

or to the property of another entity" is nondischargeable.  11 U.S.C. § 523(a)(6).  "'The terms

willful and malicious are separate elements, and both elements must be satisfied' by a

preponderance of the evidence." Khafaga, 419 B.R. at 548-49 (quoting Rupert v. Krautheimer

(In re Krautheimer), 241 B.R. 330, 340 (Bankr.S.D.N.Y.1999)).

With respect to Stephen, a judgment pursuant to § 523(a)(6) yields the same remedy as a

judgment pursuant to § 523(a)(2)(B): the underlying debt is declared nondischargeable.  Because

there is sufficient basis to grant Plaintiffs summary judgment against Stephen pursuant to

§ 523(a)(2)(B), the Plaintiffs' § 523(a)(6) claim against Stephen will not be addressed.

With respect to Sharon, as discussed above, the Plaintiffs have not met their burden of

showing that there is no genuine dispute as to any material fact regarding Sharon's actual

knowledge of the fraudulent financial statements, or that she engaged in conduct that would

justify a conclusion that she acquiesced in or recklessly disregarded Stephen's fraud.  The issues

of material fact concerning Sharon's knowledge of and participation in the fraud also preclude

entry of summary judgment on the Plaintiffs' claims against her under § 523(a)(6).

## <u>Conclusion</u>

For the reasons above, the Plaintiffs' motion for summary judgment is granted in part and denied in part. Stephen's debt owed to the Plaintiffs is nondischargeable pursuant to § 523(a)(2)(B). The Plaintiffs' motion for summary judgment as to Sharon is denied. A separate order shall issue herewith.



**Dated: Brooklyn, New York**
  **September 29, 2014**

        **Carla E. Craig**
      **United States Bankruptcy Judge**